IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 13, 2025

## STATE OF TENNESSEE v. WILLIAM DEJESUS FERNANDEZ

**Appeal from the Circuit Court for Warren County**
No. 22-CR-3830    Larry B. Stanley, Jr., Judge
_____

### No. M2024-01536-CCA-R3-CD
_____

Defendant, William Dejesus Fernandez, was convicted by a Warren County jury of attempted first degree murder where the victim suffered serious bodily injury, employment of a firearm during the commission of a dangerous felony, and two counts of aggravated assault. He received an effective sentence of twenty-seven years' incarceration. Defendant appeals, arguing that the evidence was insufficient to support his convictions. Upon review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court but remand for entry of a corrected judgment for count two consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

L. Scott Grissom, McMinnville, Tennessee, for the appellant, William DeJesus Fernandez.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Christopher R. Stanford, District Attorney General; and Felicia Walkup, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### Factual and Procedural Background

In July 2022, Defendant was staying with his long-time friend Deven Grove, the victim, at Mr. Grove's residence on Mauzy Street. Mr. Grove rented the residence and allowed three other men, including Defendant, to stay with him. On the evening of July 3, 2022, Mr. Grove and his girlfriend, Yessica Carreon, were at the Mauzy Street residence getting ready to attend a party at Chabelitas, a nearby restaurant. Defendant and Ms.

Youngblood were also at the Mauzy Street residence. Defendant and Ms. Youngblood got into a heated argument during which Defendant took Ms. Youngblood's keys and refused to allow her to leave the middle bedroom Defendant occupied. Mr. Grove intervened, and Defendant let Ms. Youngblood leave the bedroom. Ms. Youngblood fell onto her knees in the living room and Defendant threw the keys at her. Ms. Youngblood went outside and Defendant followed her outside a short time later. The two of them later came back inside and returned to Defendant's bedroom.

Mr. Grove had returned to his bedroom in the front of the residence to finish getting ready, and he and Ms. Carreon left around 9:00 p.m. for the party. Defendant arrived at the party about an hour after Mr. Grove and Ms. Carreon. At the party, Mr. Grove drank four or five beers and Ms. Carreon had "a couple" of beers. According to Mr. Grove, Defendant had "a few" beers at the party and also "went to the gas station and bought a couple . . . [forty] ounce" beers. Mr. Grove and Ms. Carreon returned to the Mauzy Street residence between 12:00 a.m. and 1:00 a.m. and went to sleep. A few hours later, they were awakened by the sound of "two or three gunshots." Mr. Grove "peeked out" of the front door and saw Defendant and Defendant's brother arguing in the front yard. Defendant's brother walked to the front porch and apologized for Defendant's behavior before leaving the Mauzy Street residence.

Defendant and Mr. Grove came back into the house and began arguing about Defendant's shooting a firearm outside. Mr. Grove recalled that Defendant was "rambling and not making sense[.]" Mr. Grove and Defendant were "kind of yelling at each other" and Mr. Grove ultimately told Defendant to "get his things and go." Defendant began carrying his belongings from the house to his car going in and out of the back door. Mr. Grove then returned to his bedroom until he noticed Defendant "was just throwing stuff from the closet . . . into the living room" which led to another argument between Mr. Grove and Defendant. During the argument, Defendant "said he would shoot [Mr. Grove] if the police wasn't there." Mr. Grove explained that Defendant referred to Ms. Carreon as "the police" because she worked for a law firm at that time.

Mr. Grove picked up one of two remaining totes of Defendant's belongings from the utility room and began walking toward the front door; he denied throwing any of Defendant's belongings. As Mr. Grove walked down the hallway, Defendant told him to put his belongings down. As Mr. Grove turned to look at Defendant, Defendant fired four gunshots. Mr. Grove said that there was a pause between the second and third shots. Mr. Grove fell against the doorframe of the middle bedroom and slid to the floor. He did not feel the second or third bullets strike him. When Mr. Grove rolled over, he saw Defendant standing at his feet holding the firearm which was "racked back," meaning that the firearm was out of bullets. Defendant did not say anything to Mr. Grove. Mr. Grove denied

threatening or making physical contact with Defendant in any way. In court, Mr. Grove identified Defendant as the man who shot him.

Ms. Youngblood came out of the middle bedroom and attempted to stop the bleeding while Ms. Carreon called 911. Both women were "screaming and crying." In Ms. Carreon's 911 call, Mr. Grove is heard telling her he loved her; Mr. Grove explained that he did this "in case something happened." Mr. Grove could not feel anything; he did not have the sensation of bleeding and could not feel paramedics moving his arms and legs. Mr. Grove assumed that the first bullet paralyzed him.

On cross-examination, Mr. Grove was unsure if Defendant had consumed alcohol earlier on July 3. He stated that Defendant usually consumed "a couple [of drinks] a day[.]" Mr. Grove thought Defendant had consumed more alcohol than Mr. Grove at Chabelitas, but he did not witness how much Defendant consumed and "wouldn't know if he was intoxicated." Mr. Grove stated that he assumed that after he kicked the Defendant out of his house, Defendant would drive himself in his car. He agreed that Defendant said some irrational things during their argument. Mr. Grove had seen Defendant act in this manner prior to the day of the shooting.

Ms. Youngblood confirmed that she and Defendant had an argument around 8:00 p.m. on July 3, which ended after Mr. Grove intervened. Mr. Grove and Ms. Carreon left the Mauzy Street residence after the argument to go to Chabelitas. Defendant left a short time later, but Ms. Youngblood remained at the Mauzy Street residence and went to sleep.

Ms. Youngblood was later awakened by the sound of three gunshots. When she opened the bedroom door she saw Mr. Grove lying on the ground and Defendant standing over Mr. Grove with a firearm "pointed down but . . . still in his hand." Ms. Youngblood was scared for her safety. She "pushed" Defendant back and "asked him what he did, and then he just quietly walked out . . . to the front door, and then [she] locked the door." After Defendant left, Ms. Youngblood attempted to hold pressure on Mr. Grove's wounds to slow the bleeding. She agreed that after she went outside, she yelled at Defendant because she was "mad and furious" that he had shot Mr. Grove. She did not believe that Mr. Grove had "asked for what he got[.]"

On cross-examination, Ms. Youngblood agreed that Defendant did not point the firearm at her or threaten her. She did not hear Defendant make any threats to Ms. Carreon.

Ms. Carreon's testimony regarding the argument between Defendant and Ms. Youngblood on July 3, 2022, was substantially similar to Mr. Grove's and Ms. Youngblood's. She added that Ms. Youngblood "kind of ran out to try and get her keys and she was so distraught, she just dropped to her knees." After the argument, Ms. Carreon

and Mr. Grove went to Chabelitas, and Defendant joined them later in the evening. She and Mr. Grove returned to the Mauzy Street residence "around midnight" and went to sleep. Around 3:00 a.m., Ms. Carreon and Mr. Grove were awakened by the sound of gunshots. Mr. Grove went outside to see what was going on, and Ms. Carreon remained in the bedroom but could see Mr. Grove through the open bedroom door. Mr. Grove and Defendant were arguing, and she heard Mr. Grove tell Defendant that "he didn't need to be outside shooting because it was late and, you know, it was just not safe. . . . So he told him he needed to not be shooting outside and that he needed to leave." Mr. Grove remained at the front bedroom door "almost the entire time" that he and Defendant argued. During the argument, Ms. Carreon heard Defendant "saying something along the lines that he would have already shot [Mr. Grove] if the law wasn't there." Ms. Carreon explained that calling her "the law" was a joke, but she did not believe Defendant was joking about shooting Mr. Grove.

After Mr. Grove left the bedroom, Ms. Carreon heard "[t]hree to four" gunshots. She ran out of the front bedroom and "saw [Mr. Grove] on the ground bleeding and [Defendant] standing [at Mr. Grove's feet] with a gun in his hand." Ms. Carreon felt that she was in danger and ran back to the front bedroom to get her cell phone to call 911. In the 911 call, which was played for the jury, Ms. Carreon was hysterical, and Mr. Grove could be heard in the background saying that he could not breathe or move.

After being interviewed by police, Ms. Carreon went to the hospital. She photographed the entrance and exit wounds on Mr. Grove's arm and the x-ray of his arm that showed "where the bullet shattered his arm." The photograph of the x-ray of Mr. Grove's chest and abdomen showed two bullets, one near Mr. Grove's collarbone and the other in his neck. Ms. Carreon testified that the shooting had changed her and Mr. Grove's lives "in every possible way that there is." She explained the bullet hit Mr. Grove's spinal cord and caused many collateral health related problems necessitating many hospital visits. Ms. Carreon further expressed sadness that Mr. Grove was confined to a wheelchair and unable to care for himself.

On cross-examination, Ms. Carreon affirmed that Defendant did not point the firearm at her or threaten her. She agreed that her initial statement did not include Defendant's threat toward Mr. Grove; she thought she had mentioned it and realized later that she had not.

McMinnville Police Department ("MPD") Detective Todd Rowland[1] arrived on scene after Mr. Grove had been airlifted to a trauma center. Several other officers were

---

[1] At the time of trial, Detective Rowland was an investigator with the District Attorney's Office. We will use his title at the time of the offenses.

already on-scene. Detective Rowland confirmed that Defendant had called 911 to report the shooting; the 911 call was played for the jury. In the call, Defendant stated that there was "a shooting on Mauzy street" and that he "shot somebody that tried to take [his] f***ing belongings out of the house and they kept of trying to f***ing antagonize [him], so [he] shot them." Defendant informed the 911 operator that he had placed his firearms on the porch and asked the 911 operator to inform officers that "it's nothing crazy. [He] just shot him because he tried to kick me out of his house, so I shot him." Finally, Defendant stated that he "tried to get [his] s*** [out] of his house comfortably but [Mr. Grove] kept on trying to throw [his] s*** out so [he] shot him." Defendant asked the 911 operator to tell the officers that he was in the middle of the street with his hands up so that he did not "get shot." Detective Rowland agreed that he did not notice slurred speech in the 911 call and that Defendant provided multiple different explanations for the shooting. Detective Rowland stated that Defendant made a "rational thought process" when he put the firearms down and insisted that the operator inform the officers that he was unarmed so that he did not get shot. He agreed that Defendant was not in a "drunken stupor[.]"

Detective Rowland confirmed that each of the responding officers had body-worn cameras on the night of the offense; two videos from the footage were admitted into evidence and played for the jury. One video showed Lieutenant Bobby Anderson arresting Defendant in the front yard of the Mauzy Street residence; Ms. Youngblood was also in the front yard. When Officer Fred Lee entered the residence, Mr. Grove was lying on his back on the floor of the hallway with his head slightly inside the threshold of the middle bedroom and Ms. Carreon was kneeling on the ground next to him. A plastic tote was lying partially on Mr. Grove's left knee. There was visible blood on the doorframe of the middle bedroom and under Mr. Grove's left shoulder. When asked what happened, Mr. Grove said, "We was arguing, and I was taking his stuff outside and he said I'll take my stuff and then he shot me." Mr. Grove stated that he thought Defendant shot him three times. When Officer Lee moved the plastic tote off of Mr. Grove's leg, he noticed a shell casing near Mr. Grove's left foot, picked it up with a piece of toilet paper from a nearby roll, and placed it on the floor out of the way. Detective Rowland confirmed that the location from which Officer Lee picked up the shell casing was an accurate reflection of its location when other officers came into the residence. Officer Lee then left the house and informed Lieutenant Anderson that there was a shell casing under Mr. Grove's left arm.

Lieutenant Anderson's body camera video started after Defendant was placed in handcuffs in the front yard. Defendant began crying and said, "I didn't want to bro." As Lieutenant Anderson conducted a pat-down search of Defendant, Defendant stated that he was trying to take his belongings out of the house but Mr. Grove "kept f***ing with [him]." Lieutenant Anderson placed Defendant in the backseat of his patrol vehicle, and when asked if he was under the influence, Defendant stated, "I've been drinking, I'm not gonna

lie to you." The video also showed two firearms on the front porch railing, a Glock 27 .40 caliber semiautomatic handgun and a .38 special revolver.

The video also showed Defendant kicking the door of the patrol vehicle in which he had been placed. When Defendant complained about the handcuffs, Lieutenant Anderson checked them, determined they were not too tight, and declined to loosen them despite Defendant's pleas. Defendant continued to argue with Lieutenant Anderson, demanded to see the officers' supervisor, and threatened to take the officers to court for not bringing their supervisor. When Lieutenant Anderson shut the car door and walked away, Defendant continued to hit the door. Lieutenant Anderson said, "Drunk or not, you're going to stop," and Defendant responded, "I'm not drunk. I want your lieutenant." The officers buckled Defendant's seatbelt, closed the door, and walked away. Lieutenant Anderson returned to the car approximately five minutes later and Defendant again complained about the handcuffs. Defendant continued to question his arrest and threaten the officers. During the interactions, Defendant's speech was not slurred.

Detective Rowland testified that based on Lieutenant Anderson's body camera footage and the investigation, he thought Defendant "had been drinking, but he was able to make rational decisions about things[.]" Defendant's choice to place the firearms on the porch railing was a rational decision. He denied that there was any indication that a physical altercation occurred in the residence; none of Defendant's belongings were "thrown" outside.

Detective Rowland confirmed that Defendant used the .40 Glock to shoot Mr. Grove. The Glock could hold nine rounds of ammunition but was empty when it was collected. Six .40 caliber shell casings were found at the Mauzy Street residence. Two were outside the house near the driveway and the other four were found in the hallway: one near the utility room, one near the entrance to the kitchen, one near the hallway closet, which was moved on camera by Officer Lee, and one under Mr. Grove's left arm. There was also a bullet hole in the floor of the hallway toward the entrance to the living room. Officers located bullet fragments from what Detective Rowland believed was the bullet that went through Mr. Grove's left arm; two bullets were still in Mr. Grove's body and one went through the floor of the residence.

Detective Rowland testified as an expert in bullet trajectory. He explained that he could only measure the trajectory of the bullet that went through the floor because the others hit Mr. Grove. By placing a "trajectory rod" into the bullet hole, Detective Rowland determined that Defendant was standing in the hallway between the door to the utility room and the entrance to the kitchen when he fired that bullet. The "placement" of the shell casings indicated that Defendant was advancing toward Mr. Grove as he continued to shoot the firearm.

Detective Rowland interviewed Defendant on July 4, 2022. After being read his *Miranda* rights, Defendant admitted to shooting Mr. Grove three times but could not recall how many times he shot the firearm. He also admitted to shooting the firearm outside the residence earlier in the evening.

"[O]ne or two days after the shooting," Defendant made a phone call from the jail to an unidentified female. A short portion of the call was played for the jury during which Defendant stated, "He's a bigger guy . . . I felt like that first shot would just tickle him. I feel like he wouldn't have felt that he would have just came at me. So, I hit him a little bit more to make sure he doesn't attack me."

On cross-examination, Detective Rowland agreed the body camera footage showed that Lieutenant Anderson referred to Defendant as being drunk four times. He further agreed that intoxicated individuals acted similarly to how Defendant acted but explained that people who "are just agitated too can do that." Defendant did not provide a breath or blood sample to check his blood alcohol content. Detective Rowland agreed that in the jail call Defendant "indicated that he was agitated because [Mr. Grove] wouldn't leave him alone[.]" Detective Rowland initially obtained an arrest warrant for the sole offense of attempted criminal homicide.

On redirect examination, Detective Rowland explained that the arrest warrant did not include aggravated assault charges because he had not interviewed Ms. Youngblood or Ms. Carreon before obtaining the initial warrant.

Based on the above evidence, the jury convicted Defendant as charged of attempted first degree murder, employment of a firearm during the commission of a dangerous felony, and two counts of aggravated assault. The trial court imposed an effective twenty-seven year sentence. Defendant filed a timely motion for new trial, which the trial court denied on September 27, 2024.

Defendant's timely appeal is now before this court.

**Analysis**

Defendant asserts that the evidence is insufficient to support his convictions in counts one, three, and four. Specifically, Defendant argues that there was insufficient evidence of premeditation to support count one and that no reasonable fear of imminent bodily injury existed to support counts three and four. Defendant does not challenge any other elements for his convictions in counts one, three, and four. The State argues that the evidence is sufficient for each conviction. We agree with the State. Although Defendant

does not challenge his conviction in count two,[2] we note that Defendant was indicted for and convicted of a violation of Tennessee Code Annotated section 39-17-1324(b)(1), "employment" of a firearm during the commission of a dangerous felony. However the judgment form lists the indicted and convicted offense as "possession" of a firearm during the commission of a dangerous felony. The correct subsection is cited, but the judgment should be corrected to name the correct offense.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

---

[2] In its brief, the State asserts that Defendant challenges his count two conviction. However, Defendant did not challenge count two in his motion for new trial and Defendant's brief does not include a challenge to count two in his issues presented nor does he cite to any authority. Thus, we do not address Defendant's count two conviction.

## I. Attempted First Degree Murder

As charged here, a person commits criminal attempt who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). First degree murder is the "premeditated and intentional killing of another[.]" *Id.* § 39-13-202(a)(1). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). Premeditation requires that an act be done:

> after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(e). As there is often no direct evidence of a defendant's state of mind, "premeditation may be proved by circumstantial evidence[.]" *State v. Davidson*, 121 S.W.3d 600, 614-15 (Tenn. 2003). The existence of premeditation is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). The jury "cannot speculate what was in the killer's mind," *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007), but it may consider the following non-exclusive list of factors to infer premeditation:

> (1) [t]he use of a deadly weapon on an unarmed victim; (2) [t]he particular cruelty of the killing; (3) [t]hreats or declarations of intent to kill; (4) [t]he procurement of a weapon; (5) [a]ny preparations to conceal the crime undertaken before the crime was committed; (6) [t]he destruction or secretion of evidence of the killing; (7) [c]almness after the killing; (8) [e]vidence of motive; (9) [t]he use of multiple weapons in succession; (10) [t]he infliction of multiple wounds or repeated blows; (11) [e]vidence that the victim was retreating or attempting to escape when killed; (12) [t]he lack of provocation on the part of the victim; and (13) [t]he failure to render aid to the victim.

*State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021) (citations omitted); *State v. McKinney*, 669 S.W.3d 753, 773 (Tenn. 2023) (citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017)). Additionally, "the firing of multiple shots can allow a jury to infer

premeditation." *State v. Hoosier*, No. M2022-01305-CCA-R3-CD, 2024 WL 3566745, at *7 (Tenn. Crim. App. July 29, 2024), *no perm. app. filed*.

Defendant asserts that he was incapable of committing a premeditated act due to voluntary intoxication. Voluntary intoxication is not a defense to a crime but evidence of intoxication "is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a). Voluntary intoxication is "intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known." *Id.* § -503(d)(3). Whether a defendant was too intoxicated to form the requisite mental state is a question of fact for the jury to determine. *State v. Kelly*, 697 S.W.2d 355, 358 (Tenn. Crim. App. 1985).

Although there was evidence that Defendant had consumed alcohol on the night of the offenses, the record supports the jury's conclusion that Defendant was not so intoxicated as to negate a culpable mental state. We note that there was minimal, if any evidence, regarding Defendant's *state* of intoxication. Both Mr. Grove and Ms. Carreon testified that Defendant had consumed alcohol, but neither was aware of the quantity of alcohol consumed nor did they testify that Defendant was drunk. *See State v. Bowers*, 744 S.W.2d 588, 590 (Tenn. Crim. App. 1987) (affirming finding of premeditation despite the defendant's claim of intoxication because the proof established only that the defendant had been drinking at a party but there was no evidence depicting the defendant as "unsteady on his feet, that his speech was slurred, or that he otherwise did not know what he was doing"). In fact, Mr. Grove testified that he assumed Defendant would have driven his car after being told to leave the Mauzy Street residence because based on his observation of Defendant, he "wouldn't know" Defendant was intoxicated.

Defendant asserts that his 911 call "clearly show[ed] signs of intoxication," that Lieutenant Anderson's body camera footage showed that Defendant was "incoherent and talking irrationally" while in the back of the patrol vehicle, and that Lieutenant Anderson stated multiple times that Defendant was intoxicated. Detective Rowland testified that Defendant's speech was not slurred in the 911 call and that Defendant was following a "rational thought process" to avoid placing himself in danger with police. Our review of the 911 call confirms Detective Rowland's testimony – there was no evidence of slurred speech and Defendant communicated clearly and effectively with the 911 operator. *See State v. Brooks*, 909 S.W.2d 854, 859 (Tenn. Crim. App. 1995) (affirming conviction despite voluntary intoxication in part because the defendant "did not appear to have difficulty answering questions and there was nothing about his condition that indicated he was intoxicated").

Additionally, Defendant did not appear "incoherent" or "irrational" while in the back of the patrol vehicle; rather, he appeared agitated and belligerent. Defendant

coherently argued with the officers regarding the tightness of the handcuffs, asked why he was being detained, asked for and remembered the officers' names and badge numbers, and threatened to take the officers to court. Detective Rowland opined that Defendant maintained the ability to make "rational choices" despite his consumption of alcohol.

The jury after viewing all of the evidence and being instructed on voluntary intoxication reached the reasonable conclusion that Defendant was able to act with premeditation. There was sufficient evidence that Defendant acted with premeditation when he shot at Mr. Grove four times, pausing between the second and third shots. Defendant later admitted in the jail call that he fired more than one shot because he thought the first would only "tickle" Mr. Grove. Mr. Grove was unarmed and did not provoke the attack, and shortly before the shooting, Defendant expressed an intent to shoot Mr. Grove had Ms. Carreon not been present. *See Reynolds*, 635 S.W.3d at 916-17.

The evidence was sufficient to support Defendant's conviction for attempted first degree murder where the victim suffered serious bodily injury.

## II. Aggravated Assault

As relevant to this case, aggravated assault is assault that "[i]nvolved the use or display of a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(iii). A firearm is a deadly weapon. *Id.* § 39-11-106(a)(6). An assault occurs when a person "intentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-11-101(a)(2). A person acts knowingly when the person is either aware of the nature of the conduct or aware that the conduct is reasonably certain to cause the result. *Id.* § 39-11-106(a)(23). The defendant's use of a deadly weapon is a "nature of conduct" element and the victim's being placed in fear of imminent bodily injury is a "result of conduct" element. *State v. Williams*, No. W2021-01071-CCA-R3-CD, 2022 WL 17728221, at *8 (Tenn. Crim. App. Dec. 16, 2022) (citing *State v. Stroud*, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *5 (Tenn. Crim. App. Oct. 29, 2007)), *no perm. app. filed*.

"Aggravated assault based on fear requires the victim to have a 'well-grounded apprehension of personal injury or violence.'" *State v. Davis*, No. E2021-01321-CCA-R3-CD, 2023 WL 1434139, at *6 (Tenn. Crim. App. Feb. 1, 2023) (quoting *State v. Jones*, 789 S.W.2d 545, 550-51 (Tenn. 1990)), *perm. app. denied* (Tenn. June 8, 2023). "The element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." *State v. Whitfield*, No. 01C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998).

Defendant asserts that no reasonable fear of imminent bodily injury existed because he did not aim the firearm at or threaten Ms. Youngblood and Ms. Carreon. Both Ms. Youngblood and Ms. Carreon were in the house at the time of the shooting and heard the gunshots. When they came out of their respective bedrooms, they saw Defendant standing over Mr. Grove with a firearm in his hand. Ms. Carreon immediately ran to call 911. *See State v. Smith*, No. W2011-02122-CCA-R3-CD, 2013 WL 6388588, at *14 (Tenn. Crim. App. Dec. 5, 2013) (noting that "fearfulness may be shown by a concern for self-defense, the inability to concentrate, and turning to the police for help" and affirming aggravated assault based on fear convictions when the each of the victim's hid, some called 911 for help, and each testified that they feared for their lives). Although Defendant did not aim the firearm at or threaten either woman, both testified that they feared for their safety because Defendant had shot Mr. Grove and still possessed the firearm. *See State v. Thompson*, No. W2024-01541-CCA-R3-CD, 2025 WL 1329044, at *7 (Tenn. Crim. App. May 7, 2025) (affirming aggravated assault conviction despite the defendant not aiming the firearm at or threatening the victim because the victim was within feet of her father when the defendant shot him), *no perm. app. filed*; *State v. Rickman*, No. W2022-01272-CCA-R3-CD, 2024 WL 3633812, at *7 (Tenn. Crim. App. Aug. 2, 2024) (finding the evidence sufficient to support aggravated assault when the defendant fired a gun at the victim's father while the victim stood a short distance away), *perm. app. denied* (Tenn. Jan. 23, 2025).

The evidence was sufficient to support Defendant's convictions for the aggravated assault of Ms. Youngblood and Ms. Carreon.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed. However, we remand for entry of a corrected judgment for count two to correct the name of the offense for which Defendant was indicted and convicted.

s/ *Jill Bartee Ayers*

JILL BARTEE AYERS, JUDGE

- 12 -